UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
DAVON TAYLOR,                                               :
                                                            :
                              Petitioner,                   :
                                                            :   05 Civ. 3034 (GEL)
              v.                                            :
                                                            :   **OPINION AND ORDER**
BRIAN FISCHER,                                              :
Superintendent of Sing Sing Correctional Facility,          :
                                                            :
                              Respondent.                   :
------------------------------------------------------------x

Randall D. Unger, Bayside, NY, for Petitioner.

Robert T. Johnson, District Attorney, Bronx County (Karen Swiger, T. Charles Won, Assistant District Attorneys, of Counsel), Bronx, NY, for Respondent.

GERARD E. LYNCH, District Judge:

Davon Taylor, a New York State prisoner, petitions for habeas corpus to challenge his conviction for his participation in the murder of a rival drug dealer, and his resulting sentence to an indeterminate prison term of 25 years to life. Taylor argues that his trial counsel provided ineffective assistance by failing to object to certain improper remarks made by the prosecutor in his summation. For the reasons that follow, the petition will be denied.

### BACKGROUND

Juzan Bracey, a drug dealer known on the street as "Pops," was murdered in a video store on Eastchester Avenue in the Bronx on December 17, 1993. The evidence at trial would have permitted the jury to conclude that Bracey was shot by Andre Lewis, a friend of Taylor's, in a dispute over drug turf. (Lewis was tried separately for murder, convicted, and also sentenced to 25 years to life in prison.)

Although the owner of the video store testified that he saw Taylor in the store that night with Lewis, and saw Lewis with a gun in his hand during a dispute with Bracey, he did not see the actual shooting and did not see Taylor do anything to facilitate the murder. The principal evidence linking Taylor to the murder was the testimony of his cousin, Melanie McDermott, who lived with Taylor and his mother at the time of the crime. McDermott testified that Lewis and Taylor sold crack together. Shortly before the killing, she overheard Lewis and Taylor discussing how they "had to kill" (Tr. 212) "a guy out by Eastchester name[d] Pop," (id. 210) who objected to their selling crack in competition with him.

Three days later, she accompanied Taylor and Lewis to the video store. While there, she saw Bracey enter the store and accost Lewis. After they exchanged words, Bracey turned to leave. At that point, Taylor told Lewis to "[g]rab that nigger." (Id. 221.) Lewis grabbed Bracey by his jacket and shot him in the head. As Bracey was falling, Taylor said, "That Nigger ain't dead, shoot him again." (Id.) Lewis shot Bracey twice more, and gave the gun to Taylor as the two men fled the store. The medical examiner testified that any of the three shots to Bracey's head would have been sufficient to kill him. McDermott further testified that Lewis and Taylor discussed the killing back at Taylor's home that evening, and sent her and Taylor's girlfriend to check out the crime scene and report back what was happening. Later, after Lewis was arrested for the murder, Taylor told McDermott he was concerned that Lewis would implicate him in the killing, and McDermott overheard Taylor telling Lewis on the telephone that he was going to threaten a witness to the killing.

Defense counsel vigorously impeached McDermott, eliciting that she did not come forward with her evidence for several years, until she was herself under arrest and, as she freely

2

admitted, hoped to use her ability to implicate Taylor in the Bracey killing in an effort to obtain leniency in her own case. In addition to pointing out a number of contradictions between her trial testimony and her grand jury testimony, the defense also elicited that McDermott had falsely accused a school teacher of sexual misconduct while still a schoolgirl in Jamaica, and that she had not gotten along well with her aunt, Taylor's mother.

The defense also called Danette Hamilton, the mother of Taylor's child, who testified that she was with McDermott at Taylor's house the night of the shooting, and that neither she nor McDermott had been at the video store at the time of the shooting.[1] The jury was thus presented with a clear question of credibility. Choosing to believe McDermott, they convicted Taylor of murder. The Appellate Division unanimously affirmed, People v. Taylor, 747 N.Y.S.2d 377 (1st Dep't 2002), as did the Court of Appeals, People v. Taylor, 1 N.Y.3d 174 (2003).

## DISCUSSION

On habeas corpus, Taylor raises a single issue, arguing that his trial attorney provided ineffective assistance by failing to object to several of the prosecutor's remarks in summation. The prosecutor's conduct in the case was indeed, to say the least, remarkable. In responding to the Court of Appeals's characterization of the prosecutor's conduct as "indefensible," 1 N.Y.3d at 176, the State seems perplexed as to "whether [the Court] was discussing the prosecutor's summation or the questions he asked during his cross-examination of [the defense witness]."

---

[1] Although the Court of Appeals referred to the defense as presenting an "alibi defense," 1 N.Y.3d at 176, Hamilton was not, strictly speaking, an alibi witness. She did not testify regarding *Taylor's* whereabouts at the time of the crime – in fact, she testified that Taylor returned home only after about 11:15 p.m., when the shooting had occurred shortly before 10:30. Rather, she testified to *McDermott's* being elsewhere at the time of the murder, thus discrediting her purported eyewitness testimony.

(Resp. Mem. 22-23 n.4.)  Either is a likely candidate, and neither rises to the level of the prosecutor's remarkable diatribe, luckily outside the jury's presence, against defense counsel and the trial judge, in which the prosecutor, continually interrupting the judge, threatened to walk out of the courtroom because he took offense at the judge's allowing defense counsel to place on the record a complaint about the prosecutor's deliberately stating to defense counsel a false accusation that the defense witness had been arrested for prostitution.  The description of this episode in the opinion of the Court of Appeals, 1 N.Y.3d at 176 n.*, is startling enough; the actual transcript is astonishing (Tr. 464-77).

Defense counsel was hardly passive during the prosecutor's shenanigans.  In addition to complaining to the court about the prosecutor's grossly inappropriate "joke" regarding the witness, counsel actively objected to the prosecutor's questions and summation.  The Court of Appeals noted that counsel "objected almost 50 times during the prosecutor's cross-examination of the [defense] witness" alone, 1 N.Y.3d at 177, a remarkable number is a cross that consumes fewer than 60 pages of transcript.  These objections were hardly random.  Nearly 30 objections during this examination were sustained, often with the question and answer being stricken, and occasionally with admonitions to the prosecutor from the Court.  Nor was counsel passive during the challenged summation.  She made at least fifteen objections during the prosecutor's 50-page summation, more than half of which were sustained, often with admonitions.  It is in that context that Taylor argues that his counsel "sat idly by" while "the prosecutor trampled on the petitioner's due process right to a fair trial."  (Pet'r Mem. 18.)

The legal standard applicable to this argument is well understood.  To succeed on a claim of ineffective assistance of counsel, a defendant must establish (1) that counsel's performance

was deficient, which requires a showing that counsel's performance was unreasonable "under prevailing professional norms," and (2) that the deficient performance prejudiced the defense, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Moreover, in order to succeed on habeas corpus, where (as here) the state courts have rejected the federal claim on the merits, Taylor "must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under [28 U.S.C.] § 2254(d)(1) . . . he must show that the [state courts] applied Strickland to the facts of his case in an objectively unreasonable manner." Bell v. Cone, 535 U.S. 685, 698-99 (2002).

Ignoring the fifteen occasions on which defense counsel objected to aspects of the prosecutor's summation, Taylor identifies a number of specific, arguably objectionable remarks in the summation to which counsel did *not* object. These remarks constitute a very mixed bag.

Taylor argues that his lawyer should have objected to the claim that the testimony of defense witness Hamilton had been "bought and paid for" by Taylor's family. (Tr. 546-47, 565-66.) As the Court of Appeals noted, the prosecutor's "choice of words was unfortunate" because "if taken literally," the charge went well beyond the evidence. 1 N.Y.3d at 177 n.*. But as the Court also aptly found, "[i]n the context of the entire summation, it is clear that the prosecutor was referring to the fact that the witness was receiving financial support from the defendant's family," id., and the argument that the witness's testimony was potentially biased by her financial as well as emotional connections to Taylor and his family was fairly based in the evidence. While the language may have partaken of rhetorical excess, there is no danger that the

5

jury was misled about the evidence supporting the prosecutor's charge. Whether the financial benefits the witness received from defendant's family colored her testimony was a question for the jury, and it was not improper for the prosecutor to put the question to it.

The prosecutor also charged that the defense witness's testimony was "carefully constructed" and "concocted" (Tr. 548-49), and had been "coached over the weekend" (id. 574). There was certainly no direct evidence of any such fabrication by the defense. However, in both instances, the argument was specifically couched as a hypothesis "submit[ted]" to the jury for its consideration. (Id.) While the formula "I submit to you that . . ." is not a magic talisman that insulates unsubstantiated arguments from criticism, it is not a denial of due process for a prosecutor to ask the jury to draw an inference from the witness's demeanor or the manner of her testimony that the testimony was fabricated or coached. Such credibility determinations are within the province of the jury, and it cannot be improper for a prosecutor to ask the jury to assess credibility or lack of it, based on its observations of the trial, in accordance with the People's position. Taylor argues that the prosecutor's arguments went beyond attacks on Hamilton's credibility and impugned the integrity of defense counsel. But the prosecutor's argument did *not* lay any coaching or fabrication at the door of counsel, but rather expressly attributed it to the defendant's mother or to the "Taylor family" generally. (Id. 548-49.) Defense counsel, in turn, *did* object to "the attack on the family," and the objection was twice sustained and a curative instruction given.

Taylor is on firmer ground in criticizing the prosecutor's discussion of McDermott's credibility as improper "vouch[ing]." (Pet'r Mem. 20.) But this argument too must be closely parsed. A prosecutor is not permitted to assert his personal opinion of a witness's credibility, or

6

to imply to the jury that he has verified the witness's story through sources not admitted into evidence. United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998). But there is nothing improper about a prosecutor's asking the jury to infer the witness's credibility based on events transpiring in the courtroom. Sometimes a prosecutor's vigorous or emphatic assertions that a witness should be believed, taken over-literally, may appear to cross the line into giving an improper opinion. In context, however, remarks like the prosecutor's assertion that McDermott "still seems to be a pretty nice young lady" (Tr. 552) or that she "is" intelligent (id.), are generally heard by the jury as appeals to assess the witness based on their observations of the testimony, not as appeals to rely on the prosecutor's opinion of the witness, and they should be so read by a reviewing court.[2]

But not all the prosecutor's remarks can be so defended. The prosecutor indulged in an unusual and improper explicit account of his own personal reaction to an item of cross-examination on McDermott's accusation of sexual misconduct in Jamaica, and his tactical decision to "st[i]ck his neck out" and "t[ake] a chance" by asking the witness to explain the matter on redirect. (Id. 554.) While defense counsel lodged no objection to this passage, she did object, successfully, when the prosecutor segued into speculation about how the incident might reflect on Jamaican "culture." (Id. 555.)

Taylor also plausibly objects to "the prosecutor's burden-shifting remarks" (Pet'r Mem. 21) in arguing that defense counsel had not asked McDermott whether anyone in the neighborhood had supplied her with details about the shooting, which would have permitted her

---

[2] Indeed, in this case, the prosecutor's challenged remarks were specifically coupled with references to how the witness conducted herself on the stand. (Tr. 552-53: "[S]he was nicely spoken, she didn't misbehave in front of you . . . , she didn't scream or lose her temper." )

7

to give a coherent first-hand account without having personally observed it. (Tr. 576.) The point is somewhat convoluted. Counsel did cross-examine McDermott on this subject, asking whether people in the neighborhood had been talking about the incident. (Id. 279-82.) The prosecutor argued in summation that whether "people [were] talking about this" was not the relevant question; rather, the "question that should have been asked of Melanie was, did anybody in the neighborhood tell you the facts of what happened inside the store." (Id. 575-76.) The prosecutor proceeded to point out that this question was asked, not by defense counsel but by him, and McDermott had testified that no one had. (Id.) Defense counsel could reasonably have objected, as Taylor does now, that the defense is not "obliged to ask particular questions of a witness." (Pet'r Mem. 21.) On the other hand, the prosecutor's remark certainly did not insinuate that the defense had a burden to prove that McDermott was not an eyewitness, and in context could be taken simply as a proper effort to distinguish between general gossip in the neighborhood about the case, which McDermott had admitted hearing, and specific first-hand details of what had happened inside the store, which McDermott testified she had observed and had not learned from others.

Finally, Taylor argues that the prosecutor crossed the line that separates legitimate discussion of the facts from improper appeals to emotion, with his characterization of McDermott herself as a "victim" of the defense and of Taylor's family (Tr. 551-53), and his excursus on the "soul" of the murder victim, who, though a drug dealer, was "capable of redemption" and might, if not the victim of "murder, most foul," have rehabilitated himself and even "become president," something his mother and sister will now never get to see (id. 579-81). The prosecutor was surely entitled to remind the jury that murder is murder, even when the

8

victim is a drug dealer or thug, to counter any tendency that the jury might have to discount the killing of an "unworthy" victim. A reasonable defense counsel might have chosen to object, however, on the theory that Taylor's invocation of the victim's relatives and his redeemable soul were excessive.

Taylor does not argue that the prosecutor's summation denied him a fair trial. The question he presents to the Court is not whether any of these remarks were improper, but whether it was an unreasonable application of Strickland for the New York Court of Appeals to unanimously conclude that defense counsel's failure to object to these particular portions of the summation was a reasonable tactical choice. An appreciation of the full context makes clear that the Court of Appeals's conclusion was not unreasonable. It is easy to excerpt a line or two from a full summation, identify a theory on which that line violates an ethical command, and then marvel at the lack of a response. In the overall context of this case and of this summation, however, the reasonableness of counsel's behavior becomes clear. As noted above, counsel objected frequently to the prosecutor's perceived departures from propriety, and achieved favorable results in the form of judicial rulings sustaining objections, admonishing the prosecutor to stick to the evidence (Tr. 540, 541, 553, 558) and granting curative instructions to the jury (id. 542, 546, 553).

Under these circumstances, Taylor's argument that counsel "sat idly by" in failing to make his specified objections is unsustainable. As noted, some of these additional alleged improprieties either were not improper at all or were close to the line, such that the failure to object clearly represented a reasonable tactical choice. Defense counsel objected frequently during the summation, and was sustained just over half the time. It is a perfectly reasonable

9

choice not to object to *every* possibly improper argument; counsel would surely prefer to seen by the jury to be on the right side of the majority of the objections.

Moreover, a reasonable defense attorney may reasonably be reluctant to make certain objections, even where it is relatively likely that an objection would be sustained. It might well alienate the jury to interrupt the prosecutor's discussion of the inherent value of human life, or of the possibility, however remote, that a young tough might yet have straightened out his life and made something of himself. Members of the jury might well have family members who have come back from misspent youths, or who they still hope may do so in the future. The defense did not question that the killing of Bracey was wrongful, and defense counsel could well assume that the jury would recognize that the relevant question was not whether Bracey should have been permitted to live but whether Taylor had helped to kill him.

The Supreme Court has ruled that counsel must be "strongly presumed" to have made all significant decisions in the exercise of reasonable professional judgment, and that a habeas petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. The Court of Appeals identified several strategic considerations that could have led a reasonable lawyer to forgo objections: the conclusion that additional objections might have annoyed the judge or jury; the possibility that the prosecutor, given enough rope, would alienate the jury; the desire not to call attention to unfavorable evidence or to highlight unfavorable inferences. 1 N.Y.3d at 177. That Court's unanimous determination that counsel's failure to object to the particular comments now identified by Taylor was "within the reasonably objective range of performance," 1 N.Y.3d at 175, was sound, and certainly cannot be characterized as unreasonable.

## CONCLUSION

For the reasons set forth above, Taylor's petition for a writ of habeas corpus is denied. Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. See 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 111-13 (2d Cir. 2000) (upholding issuance of a certificate of appealability upon finding of a substantial showing that a constitutional right had been denied).

SO ORDERED.

Dated: New York, New York
February 21, 2005

                                                   GERARD E. LYNCH
                                                   United States District Judge